## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GLENN ELWOOD VAUGHN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C. A. No. 16-370-JFB-SRF |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Plaintiff Glenn Elwood Vaughn ("Vaughn") filed this action on May 18, 2016 against defendant Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration (the "Commissioner"). Vaughn seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's March 17, 2016 final decision denying Vaughn's claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Currently before the court are Vaughn's and the Commissioner's cross-motions for summary judgment. (D.I. 13; D.I. 19) Vaughn asks the court to enter an award of benefits or, alternatively, to remand his case for further administrative proceedings. (D.I. 14 at 21-22) The Commissioner requests the court affirm the Administrative Law Judge's ("ALJ") decision. (D.I. 15 at 16) For the reasons set forth below, the court recommends denying Vaughn's motion for

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted for former Commissioner Carolyn W. Colvin.

summary judgment (D.I. 13), and granting the Commissioner's cross-motion for summary judgment (D.I. 19).

## II.  BACKGROUND

### A.  Procedural History

Vaughn filed an application for DIB and SSI on February 16, 2012, claiming a disability onset date of December 1, 2010. (Tr. at 18) Vaughn subsequently amended his alleged onset date of disability to July 5, 2012. (*Id.* at 17) His claim was initially denied on July 24, 2012, and denied again after reconsideration on February 28, 2013. (*Id.* at 125-29, 136-40) Vaughn then timely requested a hearing, which occurred on June 18, 2014. (*Id.* at 141, 36-56) On July 21, 2014, Administrative Law Judge Jack Penca issued an unfavorable decision, finding that Vaughn was not disabled under the Act because he retained the residual functional capacity ("RFC") to perform work that existed in significant numbers in the national economy. (*Id.* at 14-35) On August 8, 2014, Vaughn requested a review of the ALJ's decision. (*Id.* at 12-13) On March 17, 2016, the Appeals Council denied Vaughn's request for review, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 1-4) On May 18, 2016, Vaughn brought a civil action in this court challenging the ALJ's decision. (D.I. 2) On February 3, 2017, Vaughn filed a motion for summary judgment, and on June 5, 2017, the Commissioner filed a cross-motion for summary judgment. (D.I. 13; D.I. 19)

### B.  Medical History

Vaughn was born on July 5, 1962, and was fifty years old on his alleged amended onset date. (Tr. at 17, 41) Vaughn graduated high school and completed two years of trade school, and has worked in the past as an automobile mechanic. (*Id.* at 42, 210) Vaughn stopped working in October 2009 after he was terminated by his employer. (*Id.* at 209)

2

### 1. **Physical Health**

Prior to his amended onset date, Vaughn had a history of lower back pain, hypertension, anxiety disorder, bipolar disorder, and alcohol dependence. In December 2010, Vaughn fell and injured his right shoulder and has experienced pain and right shoulder symptoms since then. (*Id.* at 24) On January 9, 2011, Vaughn was admitted to Christiana Hospital for care for bilateral upper extremity numbness and tingling. (*Id.* at 270-80) He was unable to lift his right arm. (*Id.* at 279) An x-ray of Vaughn's cervical spine showed mild multilevel degenerative changes of the lower cervical spine including disc space narrowing and osteophytosis. (*Id.* at 343) Vaughn regularly saw his primary care physicians at Brandywine Medical for his impairments in 2012, and was regularly prescribed medications such as Xanax and Oxycodone. (*Id.* at 529-50)

On June 12, 2012, in a medical certification, Bernard Schneider, P.A., Vaughn's primary care physician, stated that due to major depressive disorder, anxiety disorder, bipolar disorder, rotator cuff injury, and cervical degenerative disc disease, Vaughn was unable to work for six to twelve months. (*Id.* at 484)

On August 20, 2012, Vaughn presented to Meadow Wood Hospital with complaints of right shoulder pain. (*Id.* at 575) On physical examination, Vaughn's upper and lower extremity strength was "5/5" and his deep tendon reflexes were "2+." (*Id.* at 576) Vaughn did not have any loss of sensation. (*Id.*) The examining physician noted that Vaughn was being scheduled for surgery for his chronic right shoulder pain. (*Id.*)

An MRI of Vaughn's right shoulder, done on September 27, 2012, revealed a moderate grade undersurface partial tearing in the distal supraspinatus tendon near the greater tuberosity attachment site and severe diffuse atrophy of the teres minor muscle. (*Id.* at 521-22)

3

On October 4, 2012, Mr. Schneider recommended updated diagnostic studies due to

ongoing neck and shoulder pain. (*Id.* at 540) Vaughn had an MRI of the cervical spine on

October 12, 2012, which showed the following results:

> Degenerative disc desiccation throughout the cervical spine; a central disc
> protrusion at C2-3 impinging upon the ventral aspect of the thecal sac; at C3-4, a
> broad disc osteophyte complex most prominent centrally impinging on the ventral
> aspect of the thecal sac with moderate to severe degenerative narrowing of the
> neural foramina; a broad disc osteophyte complex impinges on the ventral aspect
> of the thecal sac at C4-5 with impingement of the ventral aspect of the spinal cord
> without cord compression. Severe degenerative narrowing of the neuroforamina;
> unconvertebral joint hypertrophy at C4-5; annular fissure at C4-5; at C5-6, a
> broad disc osteophyte complex most prominent on the right impinges on the
> ventral aspect of the thecal sac with moderate narrowing of the thecal sac with
> relatively severe degenerative narrowing of the neural foramina at C5-6 with
> unconvertebral joint hypertrophy; and at C6-7, broad based disc osteophyte
> complexes impinges on the ventral aspect of the thecal sac with moderate to
> severe narrowing of the neuroforamina.

(*Id.* at 894-95)

On December 12, 2012, Vaughn saw his primary care physician James McGlynn, M.D.,

for piercing pain down his right arm with decreased mobility, numbness, tingling, and weakness.

(*Id.* at 514) Dr. McGlynn indicated that Vaughn's acute C5 radiculopathy seemed to be

recovering. (*Id.* at 514) Dr. McGlynn noted that Vaughn had "much less pain," and although his

atrophy had not resolved, it had improved. (*Id.*) Additionally, Dr. McGlynn noted that Vaughn

had recovered full motion and function of the rotator cuff, although he still experienced pain at

the shoulder joint. (*Id.*) Dr. McGlynn diagnosed him with a rotator cuff tear with atrophy. (*Id.*)

Dr. McGlynn administered a cortisone injection in Vaughn's AC joint and recommended

physical therapy. (*Id.* at 514-15, 517-18) Additionally, Dr. McGlynn recommended more

aggressive treatment for the cervical radiculopathy since the atrophy improved. (*Id.* at 514-15)

Beginning on December 20, 2012, Vaughn began treatment at Dynamic Physical Therapy

primarily for complaints of pain, paresthesia, loss of motion, weakness, and loss of function of

4

his right arm. (*Id.* at 618) Vaughn reported that he had a history of "neck issues," and had recently received a series of injections. (*Id.*) As a result of these injections, Vaughn stated that his pain improved and he could move his neck and shoulder "a lot better." (*Id.*) After two months of physical therapy, in February 2013, Vaughn reported that his right arm improved with increased motion and decreased pain, but his arm remained weak. (*Id.* at 640) At this time, Vaughn was able to dress himself without restriction and he felt that he had full range of motion. (*Id.*) Dynamic Physical Therapy reevaluated Vaughn again on March 22, 2013. At this time, Vaughn advised that although improving, he experienced weakness that resulted in difficulty with fine motor activities, such as lifting and dressing. (*Id.* at 592) Moreover, Vaughn reported that his right shoulder pain was constant and aggravating, and his pain level ranged from a 4 to 6 on a scale from 1 to 10. (*Id.*)

On January 17, 2013, Vaughn saw Mr. Schneider. (*Id.* at 527) Vaughn had positive joint and back pain or muscle problems. (*Id.*) On examination of his extremities, Vaughn had full range of motion, no deformities, no edema, and no erythema. (*Id.*) Mr. Schneider diagnosed chronic pain syndrome, rotator cuff syndrome of the shoulder and allied disorders, degeneration of the cervical intervertebral disc, anxiety, alcohol dependence, and bipolar affective disorder. (*Id.*) On a follow-up visit on January 28, 2013, Mr. Schneider noted Vaughn had limited musculoskeletal range of motion, and that Vaughn's cervical radiculopathy and degenerative disc disease were well controlled. (*Id.* at 775)

Vaughn saw Dr. McGlynn in February 2013 and April 2013 for his ongoing symptoms of persisting weakness, numbness, and pain in his right upper extremity. (*Id.* at 683-85) In April 2013, Vaughn elected to undergo shoulder surgery, despite Dr. McGlynn's warning that surgery may not help the weakness and pain in his arm due to his cervical radiculopathy. (*Id.* at 685)

5

On March 27, 2013, Vaughn consulted with Anne Mack, M.D., and underwent an EMG of the right upper extremity. (*Id.* at 601) Results showed evidence of right median nerve entrapment at the wrist consistent with right carpal tunnel syndrome, as well as sensory peripheral neuropathy, right multilevel cervical radiculopathy, and subacute denervation. (*Id.*)

On May 16, 2013, Vaughn underwent arthroscopy subacromial decompression on his right shoulder, Mumford, and biceps tenotomy. (*Id.* at 607) After the surgery and at the recommendation of his surgeon, Vaughn restarted physical therapy in June 2013 with pain levels ranging from "4 to 6" on a scale of 1 to 10. (*Id.* at 679, 687) In July 2013, Vaughn reported that his status was improving, and his range of motion of his shoulder was acceptable post operatively. (*Id.* at 690) Vaughn still experienced ongoing pain, so Dr. McGlynn prescribed additional physical therapy for his shoulder. (*Id.* at 689-90)

On June 5, 2013, Vaughn saw Christian I. Fras, M.D., for spine surgery consultation. (*Id.* at 694-95) Dr. Fras noted that he last saw Vaughn two years earlier in August 2011. (*Id.* at 694) Vaughn informed Dr. Fras that after his last visit, he saw Ginger Chiang, M.D., for cervical epidural steroid injections, which helped his symptoms. (*Id.*) On physical examination, Vaughn was not in acute distress. (*Id.*) Dr. Fras opined that Vaughn had cervical spondylosis and disc bulging, and was not convinced that Vaughn's symptoms in the right upper extremity would be improved by spinal surgery. (*Id.* at 695) Dr. Fras recommended that Vaughn return to pain management for a discussion regarding additional injections, and suggested that Vaughn see a neurologist. (*Id.*) Dr. Fras opined that Vaughn was unable to work. (*Id.*)

On June 24, 2013, Vaughn saw Pramod K. Yadhati, M.D., for an evaluation for ongoing upper extremity weakness. (*Id.* at 906) Dr. Yadhati noted that Vaughn had weakness and diminished reflexes in the right biceps, as well as decreased sensation. (*Id.*) Dr. Yadhati

diagnosed right C5 radiculopathy and scheduled Vaughn for epidural injections. (*Id.*) Vaughn underwent three cervical epidural steroid blocks with Dr. Yadhati on July 31, 2013, August 14, 2013, and August 28, 2013. (*Id.* at 898-900)

Physical therapy notes from July 2013 indicate that Vaughn still experienced some pain, but reported that his shoulder felt better since having the surgery. (*Id.* at 701-05, 715) Vaughn made some improvements in his strength, but still experienced deficits and difficulty with daily activities. (*Id.* at 717) On August 13, 2013, Vaughn reported that he had a nerve block injection in the neck area, which helped his pain. (*Id.* at 720) Vaughn was happy with his increased range of motion as a result of physical therapy, but was still frustrated with his bicep weakness. (*Id.* at 726, 728)

On September 11, 2013, Dr. McGlynn reexamined Vaughn. (*Id.* at 691) Dr. McGlynn noted that Vaughn had "recovered nicely" following right shoulder surgery. (*Id.*) He also noted that Vaughn had regained normal motion in his arm, but still had significant weakness in his right biceps, some shoulder weakness, loss of biceps reflex, and numbness and tingling in his thumb and finger. (*Id.*) Dr. McGlynn believed that Vaughn was a candidate for neck surgery and had failed all non-operative care. (*Id.*)

On September 18, 2013, Vaughn saw Dr. Fras with complaints of neck and right shoulder pain, as well as weakness in his right arm. (*Id.* at 913) Dr. Fras noted that Vaughn was in "obvious discomfort" upon examination, had diminished sensation to light touch in the right upper extremity, "4/5" right biceps and triceps strength, and "2+" biceps and triceps reflexes bilaterally. (*Id.*) Dr. Fras diagnosed him with cervical radiculopathy. (*Id.*)

On September 23, 2013, Vaughn saw Dr. Yadhati, who noted Vaughn's good range of motion in his neck and minimal pain in the cervical area. (*Id.* at 902) Dr. Yadhati reported that

Vaughn had weakness in the right biceps and decreased handgrip strength. (*Id.*) Dr. Yadhati's impression was right C6 radiculopathy. (*Id.*) Dr. Yadhati recommended that Vaughn continue with physical therapy, as it seemed to be helping his lower neck and shoulder pain, and to follow up with Dr. Fras. (*Id.*)

Physical therapy notes from September 2013 indicate that Vaughn continued to report that his shoulder was improving. (*Id.* at 738-46) By September 27, 2013, Vaughn was reporting improvement in his bicep strength. (*Id.* at 745) On October 4, 2013, Vaughn reported that he was getting better, and that the pain in his right should had improved. (*Id.* at 749) In November 2013, Vaughn reported intermittent pain in the right shoulder, pain with lifting objects heavier than five pounds, soreness with overhead motion, intermittent and unpredictable popping sensation in the shoulder, and arm weakness. (*Id.* at 755)

On April 21, 2014, Vaughn consulted with one of his primary care physicians, Jerry P. Gluckman, M.D., complaining of worsening right arm pain that radiated from his neck. (*Id.* at 847-50) Vaughn requested a prescription for physical therapy for his right arm, as well as an increase in Percocet for his neck pain. (*Id.* at 847) Dr. Gluckman referred Vaughn to pain management. (*Id.* at 850)

Vaughn reported no neck pain on May 7, 2014, and a musculoskeletal examination performed by Mr. Schneider revealed normal range of motion and gait. (*Id.* at 851-53) On May 29, 2014, Vaughn saw Dr. Gluckman and reported back pain, neck pain, decreased range of motion, and tingling in his right hand fingers. (*Id.* at 855)

On June 4, 2014, Vaughn underwent a physical therapy evaluation. (*Id.* at 770) The report noted reduced range of motion in his neck, atrophy in his forearm flexor, extensors, and

8

bicep flexors, and reduced grip strength on the right. (*Id.* at 771) The evaluator recommended physical therapy. (*Id.*)

Also in May and June 2014, Dr. Gluckman and Mr. Schneider jointly completed a Physical Medical Source Statement. (*Id.* at 596-99) They diagnosed Vaughn with C5-6 disc impingement with radiculopathy and myelopathy, as well as numbness of the hand and fingers. (*Id.* at 596) Vaughn was noted to have limited use of the right upper extremity, with weakness and neck pain ranging from a score of 5 to 9 out of a scale of 1 to 10. (*Id.*) They also noted that depression and anxiety affect Vaughn's physical condition. (*Id.* at 597) Dr. Gluckman and Mr. Schneider limited Vaughn to less than two hours sitting and less than two hours standing and walking. (*Id.*) Vaughn was only able to lift three pounds due to muscle weakness, chronic fatigue, adverse side effects, and pain. (*Id.* at 598) Vaughn was also limited to occasionally twisting, stooping, crouching, squatting, and climbing stairs and ladders. (*Id.*) Dr. Gluckman opined that Vaughn would be off task 25% of the day due to pain, and was incapable of low stress work. (*Id.* at 599) In addition, Dr. Gluckman noted that Vaughn would likely be absent more than four days per month due to his impairments. (*Id.*)

## 2. Mental Health

In January 2012, Vaughn was admitted to Meadow Wood hospital for major depression and alcohol dependence. (*Id.* at 346-49) George Lasota, M.D., assigned Vaughn a GAF score of 30 at admission and 35 upon discharge.[2] (*Id.* at 348)

---

[2] The GAF scale ranges from 0 to 100 and is used by a clinician to indicate his overall judgment of a person's psychological, social, and occupational functioning on a scale devised by the American Psychiatric Association. *Robinson v. Colvin*, 137 F. Supp. 3d 630, 636 n.5 (D. Del. 2015) (citing American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* (Text Revision, 4th ed. 2000) (*DSM-IV-TR*)). A GAF of 11-20 indicates "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fail[ing] to maintain minimal personal

9

On July 12, 2012, Ramnick Singh, M.D., examined Vaughn and diagnosed him with depression and alcohol dependence. (*Id.* at 491) Dr. Singh reported that Vaughn had mild to moderate limitations in his ability to work. (*Id.* at 487-88) Specifically, Dr. Singh opined that Vaughn was moderately limited in his ability to relate to other people, restriction of daily activities, deterioration of personal habits, and constriction of interests. (*Id.* at 487) Further, she opined that Vaughn has a moderate degree of impairment in performing work requiring frequent contact with others, performing complex tasks, performing repetitive tasks, and performing varied tasks. (*Id.* at 487-88) Dr. Singh noted that Vaughn "stated that most of his problems are due to his use of drugs and alcohol," and opined that Vaughn "would benefit from being sober and attending [Alcoholics Anonymous] meetings and getting treatment for his addiction." (*Id.* at 489, 491) She assigned Vaughn a GAF score of 65. (*Id.*)

In August 2012, Vaughn was admitted to Meadow Wood Hospital for depression and alcohol dependence. (*Id.* at 570-91) At the time of admission, Ujwala Dixit, M.D., assigned Vaughn a GAF score of 20. (*Id.* at 573)

From January 2013 to April 2014, Vaughn saw psychiatrist Patricia Lifrak, M.D. (*Id.* at 885-92) Dr. Lifrak diagnosed Vaughn as having bipolar disorder and alcohol abuse in early full

_____

hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." *Id.* A GAF of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work ...)." *Id.* A GAF of 41-50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." *Id.* A GAF of 61-70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning ..., but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

remission. (*Id.* at 892) At a January 2013 visit, Dr. Lifrak assigned Vaughn a GAF score of 60 to 65. (*Id.* at 892) In July 2013, Vaughn reported feeling depressed "for no reason," but did not have hallucinations or suicidal thoughts. (*Id.* at 889) During visits in August, September, and October 2013, Vaughn reported to Dr. Lifrak that he was feeling well, stable on his medications, and less depressed. (*Id.* at 886-88) In April 2014, Vaughn reported feeling depressed, but he had been in prison for five months and had been released only one week prior to the visit with Dr. Lifrak. (*Id.* at 885) Although feeling depressed, Vaughn denied having suicidal thoughts at that time. (*Id.*)

In April 2012, the state agency psychological consultant at the initial level, Vinod K. Kataria, M.D., opined that Vaughn has mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and has experienced no repeated episodes of decompensation, each of extended duration. (*Id.* at 67) The consultant also opined that Vaughn has up to moderate limitation in sustained concentration and persistence, social interaction, and adaption. (*Id.* at 71)

In February 2013, the state agency psychological consultant at the reconsideration level, Christopher King, Psy. D., opined that Vaughn has mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and has experienced one or two repeated episodes of decompensation, each of extended duration. (*Id.* at 104) The consultant also opined that Vaughn has up to moderate limitation in sustained concentration and persistence and social interaction. (*Id.* at 105)

## C. Hearing Before the ALJ

### 1. Vaughn's testimony

11

Vaughn testified that he experiences pain in his neck and has trouble "twisting and bending forward." (*Id.* at 43) Vaughn described having an aching pain that runs through his neck down his right collarbone into his shoulder. (*Id.* at 43) Vaughn testified that the pain in his neck and shoulder is constant, and it affects his ability to do things. (*Id.*) Because of this pain, Vaughn has difficulty with prolonged sitting and standing, and has to lie down two to three times an hour throughout the day. (*Id.*) Despite having surgery in his right shoulder, Vaughn testified that he still experiences pain and, through the help of physical therapy, can only lift two pounds with his right arm. (*Id.* at 43-44) To help manage the pain in his neck, Vaughn had five cervical nerve blocks that only relieved his pain temporarily. (*Id.* at 44-45) Vaughn testified that there has been muscle deterioration due to not using his arm, and that he experiences numbness from his right elbow leading down the right forearm, as well as numbness in his fingers. (*Id.* at 45)

Vaughn stated that he has difficulty sleeping, and often wakes up with pain throughout the night. (*Id.*) At the time of the hearing, he was seeking treatment for depression, and experienced crying spells and lethargy. (*Id.* at 45) Vaughn testified as to his history with alcohol abuse. (*Id.* at 46) Vaughn stated that he consumed alcohol as means to self-medicate his depression and anxiety. (*Id.*) Vaughn had a DUI in 2011, and attended inpatient and outpatient treatment at Meadow Wood Hospital in January and August of 2012. (*Id.*) After his treatment in August 2012, Vaughn had three months sobriety and then began drinking once a month thereafter. (*Id.*) Vaughn testified that the last time he had an alcoholic drink was November 20, 2013. (*Id.*)

Vaughn testified that he is unbalanced when trying to walk, and can only walk about an eighth of a mile before feeling tired or dizzy. (*Id.* at 47) He also experiences dizziness when he first stands, which can last for three or four minutes before it stops and he can move. (*Id.*) He

12

experiences numbness in his three fingers on his right hand, and has difficulty lifting light objects. (*Id.*) Vaughn lives alone, and is able to perform chores, such as cleaning and laundry, on his own. (*Id.* at 42, 48-49) Vaughn is also able to do yard work, such as cutting the grass, but has to take frequent breaks. (*Id.* at 49-50) Vaughn is able to care for his personal hygiene, but experiences some difficulty when dressing himself. (*Id.* at 50)

Finally, Vaughn testified that he does not think he would have been capable of working a full time job since 2012, because he cannot stand for long periods of time and must sit and lay down frequently. (*Id.*)

### 2. Vocational expert testimony before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("VE"):

> Assume an individual of the claimant's age, education, and work history who can perform work at the light exertional level; who can frequently reach overhead with his right arm; who can occasionally climb ramps, stairs, ladders, ropes, and scaffolds; who can occasionally balance, stoop, kneel, crouch, and crawl; who can have frequent exposure to vibration and hazards such as moving machinery and unprotected heights; and who can perform simple, routine, and repetitive tasks with no fast pace or strict production requirements with occasional simple work related decision making, with occasional interaction with co-workers that does not require teamwork or tandem tasks; and with no interaction with the public. Could this individual perform the claimant's past work?

(*Id.* at 53-54) The VE testified that this individual could not perform the claimant's past work, but, at the light exertional level, the individual described would be able to work in occupations including final inspector, control worker, and hand bander. (*Id.* at 54)

On cross examination, Vaughn's attorney asked whether a hypothetical individual who missed more than four days per month would be able to do any of the jobs that the VE outlined. (*Id.*) The VE stated that such a hypothetical would be considered excessive by an employer and would be work preclusive. (*Id.*) Vaughn's attorney also asked whether an individual who "was going to be off task 25 percent of the typical workday," or could only lift three pounds, would be

able to do the positions the VE cited. (*Id.* at 54-55) The VE testified that such a reduction in productivity would be work preclusive, and being able to lift only three pounds would "basically reduce the person to not even being capable of sedentary employment." (*Id.* at 55) Finally, Vaughn's attorney asked the VE to what extent an employer would tolerate an individual who required unscheduled breaks during the eight hour workday. (*Id.* at 55) The VE stated that if the person "is requiring breaks which are over and above those standard allowed by the employer, if they need them on a regular basis, then that would be considered by the employer... if the person was requiring an extra five, ten minute break every hour or two, then that certainly would act to reduce their productivity and also would take them beyond employer tolerances for the amount of breaks that they are typically allowed." (*Id.*)

### D. The ALJ's findings

Based on the factual evidence in the record and the testimony of Vaughn and the VE, the ALJ determined that Vaughn was not disabled under the Act for the relevant time period from July 5, 2012, through the date of the ALJ's decision, July 21, 2014. (Tr. at 29) The ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2014.

2. The claimant has not engaged in substantial gainful activity since July 5, 2012, the amended alleged onset date.

3. The claimant has the following severe impairments: degenerative disc disease of the cervical spine; right rotator cuff repair; major depressive disorder; and anxiety.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can frequently reach overhead with his right arm, occasionally

14

climb ramps, stairs, ladders, ropes, and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. He can have frequent exposure to vibrations and hazards (such as moving machinery and unprotected heights) and can perform simple, routine, and repetitive tasks with no fast-paced or strict production requirements. His work should involve occasional, simple work-related decision making, occasional interaction with coworkers that does not require team work or tandem tasks, and no interaction with the public.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on July 5, 1962, and was 50 years old, which is defined as an individual closely approaching advanced age, on the amended alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 5, 2012, through the date of this decision.

(Tr. at 19-29)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if

they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015).

Judicial review of the ALJ's decision is limited to determining whether "substantial evidence"

supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

In making this determination, a reviewing court may not undertake a de novo review of the

ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the

15

reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190-91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the United States Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250-51 (internal citations omitted). Thus, in the context of judicial review under § 405(g):

> [a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

16

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 826 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." 42 U.S.C. § 423(a)(1)(D) (2015); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *Id.* § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21–22 (2003). To qualify for

17

disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. 20 C.F.R. § 404.131 (2016); *Matullo*, 826 F.2d at 244.

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the RFC to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that

which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

## B. Whether the ALJ's Decision is Supported by Substantial Evidence

On July 21, 2014, the ALJ found Vaughn was not disabled within the meaning of the Act from the amended alleged onset date of July 5, 2012, through the date of the hearing. (Tr. at 19-29) The ALJ concluded that, despite Vaughn's severe impairments (degenerative disc disease of the cervical spine, right rotator cuff repair, major depressive disorder, and anxiety), he had the residual functional capacity to perform light work[3] and perform jobs that exist in significant numbers in the national economy. (*Id.* at 22-28)

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all

19

Vaughn asserts two main arguments on appeal: (1) the ALJ erred as a matter of law in failing to acknowledge and evaluate all of the relevant medical evidence pertaining to Vaughn's impairments; and (2) the ALJ erred as a matter of law in failing to accord adequate weight to the opinions and assessments of Vaughn's treating physicians. (D.I. 14 at 13, 19)

## 1. Relevant Medical Evidence

Vaughn contends that, in determining that Vaughn had the capacity for light work, the ALJ failed to acknowledge and evaluate all of the relevant medical evidence. (*Id.* at 13-14) Vaughn contends that "the ALJ had the duty to discuss significant evidence both supportive of and contrary to Ms. (sic) Vaughn's claim for disability." (*Id.* at 14)

To reach the conclusion that Vaughn had the RFC to perform light work, the ALJ reviewed the entire record. (Tr. at 22) After reviewing the evidence of record, the ALJ determined that Vaughn had severe impairments of degenerative disc disease of the cervical spine, right rotator cut repaid, major depressive disorder, and anxiety. (*Id.* at 19) The ALJ determined that Vaughn is capable of light exertional work activity as defined in 20 C.F.R. § 404.1567(b), except he can frequently reach overhead with his right arm, occasionally climb ramps, stairs, ladders, ropes, and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. He can have frequent exposure to vibration and hazards (such as moving machinery and unprotected heights) and can perform simple, routine, and repetitive tasks with no fast-paced or strict production requirements. His work should involve occasional, simple work-related decision making, occasional interaction with coworkers that does not require team work and tandem tasks, and no interaction with the public. (*Id.* at 22) In determining the RFC, the ALJ

---

of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

discussed and considered Vaughn's testimony, Vaughn's treating sources' notes, the state agency medical opinions, and treating source opinions. (*Id.* at 22-27)

The ALJ did not improperly weigh the physical medical evidence when concluding that Vaughn could perform a limited range of light work. Vaughn contends that the ALJ mischaracterized and ignored evidence related to Vaughn's right shoulder and cervical spine impairments.[4] (D.I. 14 at 13-18) Specifically, Vaughn contends that the ALJ: (1) mischaracterized the severity of the findings of Vaughn's diagnostic studies, including the MRI and EMG; (2) failed to properly consider numerous notations of ongoing weakness, reduced muscle strength, decreased range of motion and atrophy in the right upper extremity; and (3) failed to consider substantial evidence showing limited or no improvement in Vaughn's shoulder impairment. (*Id.*) However, the ALJ considered the evidence relevant to Vaughn's right shoulder and cervical spine impairments, and explicitly cited to Vaughn's history of treatment for these impairments, such as the MRI and EMG studies. (Tr. at 22-25) Viewing the record and treatment history as a whole, the ALJ determined that Vaughn had experienced some improvement in his neck and right shoulder symptoms with treatment and surgery, and that his mental impairments were improved with medication and treatment as well. (*Id.* at 23-24) The ALJ stated that "the facts in the record do not dispute that Vaughn has conditions, which singly or in combination may cause him pain." (*Id.* at 24) The ALJ held, however, that "these pieces

---

[4] Vaughn also argues that the ALJ erred by not mentioning Vaughn's lower back pain in his decision. (D.I. 14 at 18) Vaughn contends that although he did not testify about his lower back pain, his attorney reported it to the ALJ. (*Id.*) However, in the initial decision, Vaughn alleged disability due to a herniated disc and pinched nerve in his neck, and a torn right shoulder. (Tr. at 208-18) On reconsideration and at the hearing, Vaughn alleged disability due to worsening right arm weakness and numbness in his fingers, as well as depression. (*Id.* at 243-49, 252-61) And, as Vaughn concedes, he did not testify about his lower back pain at the hearing. (D.I. 14 at 18) Therefore, the ALJ was not required to take into consideration any alleged lower back pain in his decision.

21

of evidence suggest that Vaughn's symptoms may not exist at the level of severity assumed by Vaughn's testimony at hearing." (*Id.*) The ALJ concluded that the RFC, as he determined, gives adequate weight to the facts as determined as credible. (*Id.*) As such, substantial evidence supports the ALJ's RFC assessment,[5] and the ALJ did not improperly weigh the relevant medical evidence.

To the extent Vaughn asserts that the ALJ did not consider all relevant evidence, the Third Circuit does not require the ALJ to discuss or refer to every piece of evidence of the record, so long as the reviewing court can discern the basis of the decision. *Robinson v. Colvin,* 137 F. Supp. 3d 630, 645 (D. Del. 2015) (citing *Fargnoli,* 247 F.3d at 42). The ALJ at bar stated that he considered all the evidence of record. (Tr. at 22) The mere failure to cite to specific evidence does not establish that the ALJ failed to consider it. *Robinson,* 137 F. Supp. 3d. at 645 (citing *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir. 1998); *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (the ALJ need not evaluate in writing every piece of evidence submitted)). Having reviewed the ALJ's decision, it is evident that he considered all the record evidence and provided sufficient reasons for the court to discern his decision.

## 2. Opinions of Vaughn's Treating Physicians

---

[5] Vaughn contends that substantial evidence does not support the ALJ's finding that Vaughn had the RFC to perform the requirements of light work, because he cannot lift up to 20 pounds, nor walk for a total of approximately 6 hours of an 8-hour work day. (D.I. 14 at 18) The ALJ appropriately considered Vaughn's limitations in determining which credibly established limitations should be accounted for in the hypothetical and RFC assessment. Specifically, the ALJ noted that Vaughn's symptoms were controlled and improved with physical therapy and medication. (Tr. at 24) The ALJ appropriately concluded that Vaughn's complaints of extreme lifting limitations were not supported by the medical evidence of record, and, consequently, the ALJ was not obliged to include additional limitations in the hypothetical and RFC assessment. *Rutherford v. Barnhart,* 399 F.3d 546, 554 (3d Cir. 2005)

22

Vaughn argues that the ALJ failed to properly weigh the medical opinions of Dr. Gluckman and Dr. Fras. (D.I. 14 at 19) Vaughn claims that the ALJ improperly gave the doctors' opinions little weight, despite their treatment history of Vaughn. (*Id.*)

To determine the proper weight to give a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971). Generally, the weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4) (2012). To that end, the more consistent an opinion is with the record as a whole, the more weight is given to that opinion. *Id.* § 404.1527(c)(4).

The ALJ must first assess whether a medical opinion is from a treating, non-treating, or non-examining source. 20 C.F.R. §§ 404.1502, 416.902; *see also Fletcher v. Colvin*, 2015 WL 602852, at *9 (D. Del. Feb. 11, 2015), *report and recommendation adopted*, 2015 WL 1284391 (D. Del. Mar. 19, 2015). The opinion of a treating physician—one who has an "ongoing treatment relationship" with the patient—is entitled to special significance. 20 C.F.R. §404.1502; *Fargnoli*, 247 F.3d at 43 (citing 20 C.F.R. § 404.1527(d)(2)). On the other hand, a treating physician's opinion does not warrant controlling weight if unsupported by clinical and laboratory findings, and if it is inconsistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2); *Fargnoli*, 247 F.3d at 42-43. The more a treating source presents medical signs and laboratory findings to support the medical opinion, the more weight it is given. *See Robinson*, 137 F. Supp. 3d at 644. Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id.*

An ALJ may not reject a treating physician's assessment based on his or her own credibility judgments, speculation, or lay opinion, and the ALJ cannot disregard a treating physician's opinion without explaining his or her reasoning or referencing objective conflicting medical evidence. *Morales*, 225 F.3d at 317; *Gilliland v. Heckler*, 786 F.2d 178, 184 (3d Cir. 1986). Even when the treating source opinion is not afforded controlling weight, the ALJ must determine how much weight to assign it by considering factors such as length, nature, and frequency of treatment visits, nature and extent of the treatment relationship, whether the opinion is supported by medical evidence, whether the opinion is consistent with the medical record, and the medical source's specialization. 20 C.F.R. §§ 404.1527(d), 416.927(d).

In the present case, in June 2013, Dr. Fras opined that Vaughn had cervical spondylosis and disc bulging, and was not convinced that Vaughn's symptoms in the right upper extremity would be improved by spine surgery. (Tr. at 695) Dr. Fras recommended that Vaughn return to pain management for a discussion regarding additional injections, and suggested that Vaughn see a neurologist. (*Id.*) Dr. Fras opined that Vaughn was unable to work. (*Id.*) The ALJ afforded Dr. Fras' opinion little weight because the opinion was not supported by the evidence of the record. (*Id.* at 25) For example, the ALJ found that the physical examination Dr. Fras performed when he made this opinion was essentially normal. (*Id.*); (*see id.* at 694) (Vaughn was not in acute distress, walked with normal gait, and had "+4/5 bicep strength on the right"). Also, Dr. Fras recommended conservative treatment, recommending that Vaughn see pain management for another injection and to see a neurologist. (*Id.* at 695) Additionally, the Commissioner's regulations explain that medical source opinions that a claimant is "disabled" or "unable to work" are not medical opinions and are not given special significance because opinions as to whether or not a claimant is disabled are reserved for the Commissioner. 20

C.F.R. § 404.1527(d). Therefore, substantial evidence supports the ALJ's decision to assign less than controlling weight to the opinion of Dr. Fras, for it is inconsistent with the record as a whole.

In May 2014, Dr. Gluckman and Mr. Schneider jointly completed a Physical Medical Source Statement, in which they diagnosed Vaughn with C5-6 disc impingement with radiculopathy and myelopathy, as well as numbness of the hand and fingers. (Tr. at 596-99) They reported Vaughn as having limited use of the right upper extremity, with weakness and neck pain ranging from a score of 5 to 9 out of a scale of 1 to 10. (*Id.*) They also noted that depression and anxiety affect Vaughn's physical condition. (*Id.* at 597) Dr. Gluckman and Mr. Schneider limited Vaughn to less than two hours sitting and less than two hours standing and walking, lifting three pounds, and to occasionally twisting, stooping, crouching, squatting, and climbing stairs and ladders. (*Id.* at 598) Dr. Gluckman opined that Vaughn would be off task 25% of the day due to pain, was incapable of low stress work, and would likely be absent more than four days per month due to his impairments. (*Id.* at 599) The ALJ assigned Dr. Gluckman's opinion little weight because it was "not supported by the evidence of record." (*Id.* at 25) Specifically, the ALJ found that "the evidence of record demonstrates that although [Vaughn]'s physical symptoms did not completely resolve, they have improved," and, "diagnostic testing and physical examinations do not support a finding that Vaughn is completely unable to work." (*Id.*) Physical therapy notes from September 2013 indicate that Vaughn continued to report that his shoulder was improving. (*Id.* at 738-46) By September 27, 2013, Vaughn was reporting improvement in his bicep strength. (*Id.* at 745) On October 4, 2013, Vaughn reported that he was getting better, and that the pain in his right should had improved. (*Id.* at 749) Although a physical therapy report dated June 4, 2014 noted reduced range of

motion in Vaughn's neck, atrophy in his forearm flexor, extensors, and bicep flexors, and reduced grip strength on the right (*Id.* at 771), this is consistent with the ALJ's finding that although Vaughn's symptoms were not resolved, they improved with medication and physical therapy. Moreover, Dr. Gluckman, in addition to Dr. Fras, Mr. Schneider, and Dr. McGlynn, recommended conservative treatment. (*Id.* at 850) ("plan: refer to pain management"); (*see also id.* at 515, 517-18, 689-90) (referred to physical therapy). Therefore, substantial evidence supports the ALJ's decision to assign less than controlling weight to the opinion of Dr. Gluckman, for it is inconsistent with the record as whole.

## V. CONCLUSION

For the foregoing reasons, the court recommends denying Vaughn's motion for summary judgment (D.I. 13), and granting the Commissioner's cross-motion for summary judgment (D.I. 19).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006*)*; *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: August 21st, 2018

Sherry R. Fallon
United States Magistrate Judge